And at this time, we'll hear Muschette v. Gianfrido. Good morning.  Good morning again. Scott Carston representing Police Officer Paul Gianfrido from the West Hartford Police Department. I have reserved two minutes for argument, and I will try to stick with my time. I do want to start out by recognizing that the defendant who tasered a 12-year-old African-American deaf child who has ADHD and psychological trauma may appear to be facing an uphill battle for a starting point. But we are confident that the principles of qualified immunity protect this officer under the circumstances of this case. It can't be just because it's a device that has not been tested. I mean, you know, excessive force could be used in different ways, and the fact that it's a taser is not, and we don't have a taser case, isn't really relevant, right? I'm not sure I follow Your Honor's question. Well, all I'm saying is that you can use excessive force with a device, and it can be found to be excessive and found no qualified immunity, if it's notwithstanding that maybe there's no direct precedent on point, right? You know, it depends. So let's just leave that aside. Why don't you point out the reason why you think qualified immunity should apply here. Yes, sir. I think, as is well known to the Court, the first prong of the qualified immunity analysis relates to whether there is clearly established law on the point in question. And the basic premise is that, and it's well known to this Court. We know that, and we know that doesn't have to be precisely on point. Yes. But the officer reasonably has to know or understand that he would be violating the law. The basic contours? I'm sorry? It's an objective understanding. I don't want to commingle the objective aspect of it, because the ---- I'm not talking about commingling. We're talking about a reasonable officer. Yes. I mean, an officer can't go out and do something horrible and say, well, I didn't know that it was a violation of the law. Everybody agrees that what he did was a horrible violation of the law. No question but that the hope versus ---- That's what we're talking about, a reasonable officer. Yes. No question but that the hope versus Peltzer analysis, where the prisoner was shackled in the stockade in the open sun for 24 hours, is a clear example of a situation where, even though the circumstances were novel, it was clear in both a legally and perhaps even a morally objective sense. Apart from how to apply the standards, why don't you just talk about the facts here? Wasn't the ---- what was the boy? The boy, at that point, he'd acted out. He'd apparently assaulted one of the people with once, I guess, with a rock and also with a stick or something of that sort. Yes. And your officer appeared on the scene, and he was retreated into a construction area at that point. He had done that before the officers were summoned. Right. And what did the officer know at that point? I'm sorry? Before he used the taser. The officer, Officer Jim Frito in particular, was told by Dean Davis that the boy had thrown rocks at staff, had struck another staff member with a stick, and had run into this construction zone and was sitting there holding a rock, and that the officer was told again by Dean Davis that he should be careful entering into that area because the boy would throw the rock at the officer. I'll also note that it was getting dark, depending on ---- this is April 30th of 2013. It's about ---- How does that have a bearing on this? There are cases, including from the circuit, in which approaching nightfall is a circumstance that the officers are entitled to take account of for a number of reasons. For example, in this case, they're in a construction area, which is of unknown terrain, unknown equipment, unknown substances, and the boy could jump up and run away, just as he had done from the dorm that he had been in when he wrapped the video phone wires around his neck to the point at which his face turned red. That's how distraught this boy was. The officer knew that there was a psychological problem here. Counsel? Yes, ma'am. What about the factual dispute as to whether the boy was getting any information? Can you speak to that? Yes, Your Honor. There are four points with respect to that, points of evidence, actually. There's the boy's testimony from his first deposition session, in which he says that the officers weren't communicating, nobody was trying to talk to him. Then there are three statements in the plaintiff's Rule 56A2 statement, which at least in our district I believe to be binding judicial admissions, one of which is an admission by the plaintiff that he saw Christopher Hammond, one of the ASD staff members, signing to him. Second, that Hammond told, and these are admissions in the 56A2, that Hammond told the plaintiff through sign language that he was going to be tasered if he didn't drop the rock, and this was his last warning. And finally, and this is crucially important from Judge Walker's question, the officer believed that his communications were being successfully and effectively passed along to the boy. Are you saying that the plaintiff takes that position? It's admitted in the 56A2 statements, Your Honor. And that set forth that. And he's admitted what exactly? That he read the signs? That he saw Christopher Hammond, the ASD staff person, signing to him? That Hammond. Did he get the information that he was signing? I'm just telling you what the admissions in the Rule 56A2 statement say. And that is that he saw the signing, the signer, Hammond, said, I told him that he was going to be tasered if he didn't drop the rock, and it was his last warning. And most importantly, again, the officer believed that his warnings to the student were being effectively communicated and received. That's a very important point. Yes, it is. What I want to know is exactly what the basis is for that belief. In other words, did the boy, you're saying that the boy in effect admitted, the plaintiff admitted to that? That the officer believed that the warnings were communicated? At the completion of all discovery, and again, it's at the appendix, pages A349 to A351 and 52. Could you give those pages again? Yes. A349, 351 to 52, and 355. And it's also discussed at pages 19 to 22 of our brief. And those are critical because they're at the end of discovery. They're admissions that are signed off on by counsel, and they reflect all of the information in the record as of that time. They're representations to the court. And we consider them to be something that both we and the court are entitled to rely on. Counsel? Yes, ma'am. Can you distinguish between the first taser and the second taser for us? Why was the second taser administered? The second taser, Your Honor, was administered because the second officer, Officer Leith, was too far away from A.M., the student, to gain control of him after the conclusion of the first taser cycle. The first taser cycle was somewhere between two and five seconds. At the conclusion of that cycle, a subject is instantly able to regain muscular control. Wait, except he dropped the rock after the first taser. Yes. Right? And as far as you know, was able to be handcuffed and taken away. Officer Leith was struggling with the student, and the student made a movement, according to Officer Gianfrido, to pick up the rock again. And that's why he administered the second, in order to secure the – Is that disputed? It is not disputed. And it's also – Where would we look to see that the other side concedes that after the first taser, A.M. moved to pick up the rock again? I don't know that they concede that point. Well, I mean, you have to live with their facts. That's not in the record. Not your facts. I do, but it's also the case that nowhere in the complaint, nor anywhere in this case has it ever been alleged that the second taser was applied maliciously or for any other reason. It doesn't have to be malicious to be an excessive use of force. No. Malicious is not the test. But we would argue that if the first taser deployment is justified under the circumstances here, the second one is as well. Well, that's not – I mean, I know of cases from this Court in which the second or the third taser is deemed to be unnecessary and abusive. Agreed. And there are also cases – Isn't that going to mean that you can just torture somebody endlessly? Understood. But it also is the case that in Kroll v. Kirkpatrick, three taser applications were deemed not excessive against – In that case, they may not have been excessive. These were nonpassive, nonfleeing, nonaggressive protesters who were – had three taser deployments because they were deemed necessary to control their actions under the circumstances of that case. Look, I just want to go back, if I may, briefly – I actually haven't seen any argument attacking the second taser application in this case anyway. Right. That's right. Thank you, Your Honor. But I want to go back to that third admission, because there is no question in this case that the applicable law – and I want to, if I can, move beyond – let me back up. On the qualified immunity issue. Well, you're over your time, so just conclude quickly. All right. I'll go back to the objective reasonableness. There is no question but that the applicable law in this case requires that the circumstances be viewed from the perspective of a reasonable officer on the scene. And in this case, there is no dispute, given the admissions, that Officer Gianfrido believed that his warnings and his commands were being successfully communicated to that boy and were then being deliberately ignored. And given that situation, then you have to ask, what are the officer's options? He's facing a situation where he may need to make an arrest for a criminal assault, and he's certainly going to have to have the boy shipped to a hospital for a psychological evaluation. In either case, there's going to be a hands-on circumstance, and the officers are going to have to take that rock away from the boy, and they're going to have to put him on a stretcher. That's why it's important to separate, I think, out between the two tasers, because if he dropped the rock because of the first taser and the threat was gone, then it's hard to see how the second one is justified. The rock was right there, Your Honor, and the officer testifies that he believed that the boy was right there to be picked up. There to be picked up. Yes. Okay. You've reserved two minutes for rebuttal. I did. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Andrew Raczynski for the appellee. This is a case where, in a matter of a minute and 49 seconds from the police officers getting on the scene, that a 12-year-old deaf boy was tasered twice by police officers. And by everyone's admission, at no point in time did this 12-year-old boy exhibit any violent behavior, made any sudden moves. He had exhibited violent behavior before, and the officer was told about it and also knew that he had a rock and that one of the people he had previously assaulted was there and had to be there close by him in order to sign the warning about the taser. Yes. They were told that he exhibited violent behavior, but it doesn't justify them taking their time to assure that they don't just go in and taser him. You can't micro kind of look back at fly spec in hindsight what the officers do under these circumstances. If they're confronted with a situation and they respond a certain way, that is not unreasonable under the circumstances. And part of what you have to take into account is what the officer understood. And apparently, which I was not fully aware of, is that there seems to be no dispute over the fact that the officer believed that the warnings were being conveyed and disregarded. So the admissions that counsel have averred to are just not the case. They say that my client admitted that he understood the warnings, and that's just not true. Repeatedly in the statement, he states, and in his deposition testimony, he states he did not see those warnings. And this question is did he concede that the officer had reason to believe that his commands were being effectively communicated and received? He said in his deposition transcript that he did not know one way or the other and could not know whether they were effectively communicated or not because he was behind the 12-year-old boy and did not know if it was communicated because he did not get confirmation. Well, I mean, he was communicating the warnings to the dean, I think, who was Now, the argument is your client was looking down, but nothing says if you're looking down that you can't, you know, look up at the same time. And he apparently concedes that he saw the use of ASL. Hammond's signing to him. Correct. But he did not get confirmation that he understood from Chris Hammond because in his testimony, he says, I asked him. There's no evidence on that one way or the other. There's no evidence to really say that, at least from your client, there's no evidence. The officer testifies that he could reasonably believe that his warnings were being conveyed because he was seeing the signing going on. Your client can't really dispute what was in the officer's mind, it seems to me. Correct.  And that's a big part here that I think what the court got correct in its decision is saying that, you know, there's serious credibility determinants on all sides to determine whether the officer's actions were reasonable or not based on the circumstances. Does your client to this day deny that he got any instructions, any information? Correct. Yes, Your Honor. He denies. So when he was hit in the back with a taser, he was just taken by surprise? Yes. He testified that he was completely surprised. He didn't even know that the police were behind him. What does that have to do with what the officer could reasonably assume and believe? The officer was conveying to the dean of a school for the deaf a warning that kids could be tased unless he dropped the stone or gave himself up to restraint, and that was being conveyed to a teacher. They're both experts in ASL, and ASL is a language, and the officer could see that Hammond was signing to the boy. I mean, why would Hammond be signing to the boy if the boy wasn't looking? Well, in sign language, someone has to be looking at you. That's right. For you to actually receive that information. So someone could be signing vigorously to you, and you wouldn't — if your eyes are closed, you don't know what they're saying. And so that's the dispute. But why can't the officer assume that Hammond, a teacher at this school, would not be signing unless he had made eye contact? I mean, I think Mr. Hammond is himself deaf, so he understands the situation as well as anybody can. Right. And the reason that it was probably exaggerated was because if you are trying to get the attention of a deaf person who is not looking at you, your exaggerations are going to be more — Let's say that that's so. Yes. Let's say that that happened. Why should the police officer make that assumption? Why can't the police officer assume that having conveyed the warning to the dean of the school and watching it being conveyed by Mr. Hammond, who's a teacher at the school, that the student is receiving it? He never got confirmation from Chris Hammond that he understood and that he wasn't going to comply with the — what the officer says is that all he saw was the kid looking down and shaking his head, and that's — that was enough confirmation for him to show that he wasn't going to comply. He never even asked Chris Hammond, did you convey the message? It's not an issue of whether he was signaled whether he'd comply. The question is, was he warned that if he didn't comply, he'd be tasered? Well — I mean, if he wasn't going to comply and sit there with a rock and be able to break the head of Mr. Hammond at any moment he chose, that's not a very comforting situation. The police don't have to tolerate it. Right. And what the police officer said is that he had no concerns about safety by bringing in civilians into the fenced-off compound, because if he made any sudden movements or did anything, that he could neutralize the situation immediately. Well, obviously he had to bring civilians in because the police officer — it would be unusual if the police officer could master sign language, but he had to bring in the teachers and faculty in order to communicate with the child. So even assuming it was communicated, we're still not focusing on the time that it took. Why wasn't it fully communicated? Why weren't alternative methods tried to be used? For instance, to get the attention of a — One alternative method was a warning. And that seems to be in the case. There was a warning given. Now, maybe your client — whether your client saw it or not, but that was an effort that was made to diffuse the situation before using the taser. So that's — What alternative methods were available? So being from a school for the deaf, they should know that to get the attention of a deaf person, you can use light to get the attention of a deaf person. Had someone — had Chris Hammond or someone who was in front of him actually used a flashlight and flashed it to A.M., that could have gotten his attention, and that could have — instead of just raising your hands and doing it this way, it would have been way more effective to get the attention. The position that your client did not see any — did not know anybody was signing? I thought that that was something that had been admitted. No, that's completely inaccurate. He never admitted in his deposition that he saw anybody. He was shaking his head no. He was shaking his head no, presumably negating something that was being said to him. That's what the officer said that he saw, that he was shaking his head no. Looking down and going like this. Shaking his head no. And so — Now, why should Officer Gianfredo know about this light device as a superior way of getting the attention of a person who is deaf and does not wish to pay attention when Mr. Hammond, who's a professional, doesn't know it or didn't use it?  Why should Officer Gianfredo be taxed or made to pay for some negligence that you're identifying on behalf of Mr. Hammond? Well, had he taken his time to assess the situation and taken his time to communicate with the professionals on the scene, instead of in a minute and 49 seconds coming onto the scene and tasering him twice, I think that he could have gathered more information to better be equipped to work with AM to ensure that they didn't have to use a taser and they may be able to use other means. And it was — no reasonable police officer would consider, as this officer apparently did, that it's better to use a nonlethal and non — a device that inflicts no permanent injury rather than wait to see whether a person who's obviously out of control doesn't hit Mr. Hammond over the head with a rock? Well, there's no evidence that the police officers saw for themselves that he was out of control or doing anything that was threatening whatsoever. They were told that he was. They had been called by the — I mean, if he was under control, you'd think that the dean and the teacher would be able to control him. Well, even the 911 calls says that he's under control at this point. And so they were aware that the situation had been neutralized, but they needed a police officer to calm him down or to bring him to his senses. The situation is okay. People don't usually call the police. Well, because he was in the construction site on his own and he wasn't, you know, leaving the construction site. He was just sitting there on the ground with a rock and the staff didn't know what else to do at that point. And so that's why they called the police. Thank you. Thank you. We'll hear from Bob. Thank you, Your Honor. Counsel, in order to seek qualified immunity, don't you have to accept as true all the plaintiffs' allegations? No, Your Honor. I thought that was the law. The law is that if there are undisputed facts, those need to be accepted. If there are disputed facts, then inferences are drawn in favor of the plaintiff. Undisputed facts do not need to be accepted in favor of the plaintiff. And we've just heard from the plaintiff's counsel that he didn't get the message, that he didn't see the signing. How can qualified immunity go forward in that case if that's a disputed fact or a controverted fact? In our view, Your Honor, that stray statement from the deposition is in the order of a sham affidavit that is not sufficient to create a disputed issue of material fact. When it's controverted... It may be. The question is, does it bear upon what the police officer, what the defendant reasonably believed and reasonably did? That's true. And to that point, what the kid says he perceived is not really pertinent to what the officer who was standing behind him perceived, which was what the interactions between Dean Davis and Christopher Hammond were. Your position is that the officer knew he'd given a warning. He'd given a warning to Davis to give to Hammond. Yes. And that... The officer has to accept as true what the plaintiff says in order to seek qualified immunity. That's the point. Even accepting that as true, Your Honor, I think Judge Jacob's point is that it's not material to the question of what the officer perceived based on what was going on around him. He can't be in the... The issue I have is, the question I have is, is it disputed that the officer gave the warning to Davis and saw that the warning was being, apparently could believe that the warning was being communicated from Davis to Hammond and from Hammond to the defendant, and that the defendant who had his back to him was shaking his head and was not dropping the rock? None of those facts is disputed. None of those facts are disputed. No, Your Honor. Well, he did drop the rock, actually, didn't he? After he was tasered, Your Honor. And then he was tasered again. Yes. Because the rock was still... He saw that the rock was still close by? Yes, Your Honor. Right next to him. Thank you. May I make one more... Thank you both. We are done with the argument. We will reserve decision. The last case on calendar is Vassell v. Mortgage Electronic Registration Systems.  That being the last case on calendar, please adjourn the Court. Thank you, Your Honors. Thank you, Your Honor. Thank you.